**In re Application of DAILY NEWS.**

**In re Application of NEW YORK POST.**

**UNITED STATES of America**

**v.**

**John GOTTI and Frank Locascio, Defendants.**

**No. CR–90–1051.**

United States District Court, E.D. New York.

March 13, 1992.

**320**

Charles R. Beeman, New York City.

Joel Cohen, Stroock & Stroock & Lavan, New York City.

Andrew J. Maloney, U.S. Atty., for U.S.

Albert J. Krieger, Miami, Fla., for Gotti.

John W. Mitchell, LaRossa, Mitchell & Ross, New York City, Anthony M. Cardinale, Boston, Mass., for Locascio.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

On Friday, February 21, 1992, counsel for the *Daily News* hand-delivered a letter to the court on behalf of their client and also on behalf of the *New York Post, The New York Times, New York Newsday,* the *Staten Island Advance,* and WNYW–TV. This submission requested an opportunity to be heard as quickly as possible concerning the media's applications that (1) transcripts of recent sidebar conferences and conferences held in chambers be unsealed and that (2) future sidebar conferences conducted while the jury is absent from the courtroom and conferences in chambers be held such that the media has access to them contemporaneously or at the earliest practicable time. Counsel's letter correctly expresses an understanding that transcripts of several sidebar and chamber conferences have been sealed. The letter then proceeds to a brief discussion of the media's interpretation of the relevant caselaw (reference to which was also made when the court held the requested hearing on the morning of February 24, 1992).

By letter dated March 5, 1992, counsel for the *New York Post*—acting on behalf of an *ad hoc* consortium of other news organizations, including National Broadcasting Company, Inc. in addition to those already named in the letter of February 21, 1992—made a similar application and also requested an opportunity to be heard at the court's earliest convenience. That opportunity was afforded counsel on March 10, 1992. In this letter, as well as in the letter of February 21, 1992, counsel felt obliged to call the court's attention to what they perceive to be the court's constitutional obligation as defined in reported cases. The court's familiarity with its obligations and with the controlling cases, it ventures to hope, have been adequately reflected in two opinions already written on this subject during the course of this case. *See United States v. Gotti,* 753 F.Supp. 443 (E.D.N.Y. 1990) and *United States v. Gotti,* 771 F.Supp. 567 (E.D.N.Y.1991).

Before turning to the relevant cases and to a consideration of the legal principles this court understands them to announce, a brief history of what has already transpired may be useful to put into context and into focus the matter now before the court. Since the return of the indictment in this case in December 1990, issues of more than routine complexity have been continuously presented for resolution. Most important for purposes of this proceeding is an order issued on November 14, 1991 directing that the jury for this trial be sequestered and anonymous. Although that order, found at 777 F.Supp. 224, sets forth in detail the reasons for that decision, it is useful to summarize them here.

During Gotti's previous trial in this district, defense witness Matthew Traynor perjured himself; Traynor later asserted under oath that Gotti and Gotti's attorneys had suborned his perjury. Further, in the course of that trial, the presiding judge, Judge Nickerson, found Gotti responsible for the intimidation of a witness who refused to identify Gotti at an earlier state trial despite having identified him on other occasions and despite having testified against him before the grand jury. In addition, this court took note of specific allegations of jury tampering directed at sever-

al of Gotti's associates, including his brother Peter. Finally, this court also noted the inordinate amount of publicity that this case had already generated and the certainty that such extraordinary media coverage would continue throughout the trial. In the period since the issuance of that order, the prediction of continued intensive media coverage has proven accurate.

On January 21, 1992, a venire of approximately 550 persons was summoned. After being instructed by the court, each member of the venire completed a twenty-one page questionnaire which was then duplicated and distributed to the court and to the parties. The following several days were occupied by the court and counsel reviewing thousands of pages of responses in order to determine who among the veniremen should be dismissed for cause. The individual *voir dire* of those veniremen not disqualified began on January 29, 1992. Over the following two weeks, more than two hundred prospective jurors were interviewed individually by the court in the presence of the parties, counsel, and one media representative. The media representative rotated throughout each day to permit print, radio, and television organizations to attend the proceedings.

It quickly became clear during the course of the individual *voir dire* that many prospective jurors could not serve because the projected length of the trial during which they would be sequestered would impose an undue hardship, because of bias stemming from the notoriety with which the media has invested the defendants, or because of fear. (More than one potential juror entered the room shaking uncontrollably or in tears.) The veniremen who were found qualified after this screening process were immediately sequestered under the supervision of the United States Marshals. At that stage, the court declined to impose full sequestration restrictions (such as censorship of all print and broadcast communications and monitoring of phone calls and familial visits) in the hope that it would mitigate the rigors of sequestration for those who might never ultimately be chosen to serve as jurors.

During this period, the court received notes from sequestered potential jurors requesting to be excused for a variety of reasons including fear for personal safety, the hardship of sequestration, and other legitimate concerns. Approximately 18 potential jurors were lost in this manner. Particularly disturbing were the requests to be excused prompted by concern that anonymity was compromised through identifying data revealed during the *voir dire* and subsequently published in newspapers (notwithstanding the awareness of media representatives of the great lengths to which the court had gone to preserve juror anonymity). Prospective jurors were shocked to read in the press responses made by others during the *voir dire* process. They questioned the court's assurances that their anonymity would be sedulously guarded, and several who were initially qualified were subsequently excused because of fear that their identity and the identities of their families would become known.

In the middle of this process, it came to the court's attention that documents submitted under seal had fallen into the hands of the media. The media published the contents of these documents even after at least one reporter had confirmed with the office of the United States Attorney that the documents were in fact sealed. Immediately thereafter, the court was compelled (on the legitimate request of the defendants) to examine each of the potential jurors individually and outside the hearing of the press and counsel, and to dismiss those jurors whose objectivity had been compromised. The transcript of those interviews, conducted on the mornings of February 3 and 4, was sealed.

Between that time and the filing of the *Daily News* motion, the court also sealed the transcripts (totalling approximately 55 pages) from three *in camera* and sidebar conferences. Five more *in camera* conferences from the week of March 2 have been sealed since then.

I

A. *In Camera Questioning of Jurors*

The Supreme Court first had occasion to decide whether the guarantees of open pub-

lic proceedings in criminal trials apply to *voir dire* examination of potential jurors in *Press Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press Enterprise I*). In that case, a California trial court conducted a *voir dire* over a period of six weeks, all but three days of which was closed to the public. The Supreme Court held that the presumption of openness applicable to criminal trials extends to the jury selection process and "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 510, 104 S.Ct. at 824. The Court also recognized that "[t]he jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain." *Id.* at 511, 104 S.Ct. at 824; *see also Cable News Network, Inc. v. United States,* 824 F.2d 1046 (D.C.Cir.), *cert. denied,* 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987). Two years later, in *Press Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press Enterprise II*), the Court was called upon to decide whether the presumption of openness applied to preliminary hearings in a criminal case and decided that it did. The preliminary hearing in question continued for 41 days and was closed to the public. The Court there reiterated the principle stated in *Press Enterprise I* that "proceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Id.,* 478 U.S. at 11, 106 S.Ct. at 2741.

Counsel for the media acknowledge, as they must, that the First Amendment right they assert is not absolute. They recognize that the trial judge has an interest in protecting juror privacy. They recognize too that the Sixth Amendment right of the defendant to a fair trial may weigh more heavily in the balancing of Sixth and First Amendment rights and may therefore justify the imposition of limitations upon the latter. Although not explicitly provided for in the Constitution, it is submitted that the interest of the government in a fair trial is a significant one, which also demands recognition in the First Amendment equation.

Chief Justice Burger, in *Press Enterprise I,* declared that "[n]o right ranks higher than the right of the accused to a fair trial." 464 U.S. at 508, 104 S.Ct. at 823. That case also recognized that

a trial judge may, *"in the interest of the fair administration of justice,* impose reasonable limitations on access to a trial. '[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.'"

464 U.S. at 511 n. 10, 104 S.Ct. at 824 n. 10 (emphasis added) (quoting *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581–82 n. 18, 100 S.Ct. 2814, 2829–30 n. 18, 65 L.Ed.2d 973 (1980)). As the Supreme Court also recognized in *Press-Enterprise I,* privacy interests may constitute a reason sufficient for closure. In some cases, such as in the facts of *Press–Enterprise I,* the privacy interest may relate solely to embarrassing information of a personal nature about the juror himself. In other cases, however, juror privacy may coincide with the defendant's Sixth Amendment rights, as "the defendant has an interest in protecting juror privacy in order to encourage honest answers to the *voir dire* questions." *Id.,* 464 U.S. at 515, 104 S.Ct. at 826 (Blackmun, J., concurring). Moreover, "[t]he State has a similar interest in protecting juror privacy, even after the trial—to encourage juror honesty in the future—that almost always will be coextensive with the juror's own privacy interest." *Id.*

However, to confine the limitation on the right of access only to the juror's right of privacy and to juror safety is too narrow and unrealistic. For example, in considering whether a jury should be anonymous and sequestered, a court must consider the interest of the criminal justice system in

protecting not only the jurors but also their families from the anxiety induced by the possibility of jury tampering. It is not sufficient to argue that sequestration insures against those hazards. A sequestered jury is not hermetically sealed in a sterilized compartment. They enjoy visits with their families and communication between them is inevitable.[1] It is also important to remember that our system contemplates that the "jurors will inconspicuously fade back into the community once their tenure is completed," *United States v. Gotti*, 777 F.Supp. 224, 226 (E.D.N.Y.1991), and the importance of remaining anonymous is not at all diminished by the completion of that tenure. Thus, the right of access claimed by the press must also be weighed against such compelling concerns as the privacy and peace of mind of jurors' families—as well as the relationship of those matters to the integrity of a pending criminal trial.

The environment in which this case has been before the court since its inception defies description. The media attention devoted to it from the day of the arraignment and through the complex pretrial proceedings, jury selection and now as the trial progresses is perhaps unprecedented. Forty out of eighty seats in the courtroom have been designated for representatives of the print and broadcast media. Accounts of the trial have appeared in countries around the world. Members of the public desiring to attend the trial queue up, the court is informed, as early as 2 a.m. each morning. During the process of selecting a jury a major television network invited its viewers to indicate by telephoning designated numbers whether they were or were not afraid to serve on the jury. As this opinion is being written, a New York tabloid is conducting a poll requesting its readers to indicate whether they do or do not believe a principal government witness against the defendant. Front-page headlines of New York newspapers have

prompted the defendants on several occasions either to request renewed *voir dire* of jurors or to move for a mistrial.

It is in this environment that the court has sought to maintain the integrity of the judicial process and to provide to the defendants and the government a fair trial. It is in this environment that the court, in the interest of the fair administration of justice, imposed the minimal restrictions it has on access to interviews with jurors. Those considerations—namely, the integrity of the judicial process, the right of the defendants and of the government to a fair trial, the abiding interest in the fair administration of justice, and the privacy concerns expressed by the jurors for themselves and for their families—are the "higher values" which have moved this court.

*United States v. Edwards*, 823 F.2d 111 (5th Cir.1987), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988), addresses the issue of access to private judge-juror interviews more comprehensively than any other case of which the court is aware on facts which are not qualitatively different from these. In holding that failure to provide a hearing before conducting midtrial questioning of jurors in a highly publicized criminal prosecution did not violate the First Amendment and that refusing to release transcripts of closed proceedings before the jury reached its verdict was not erroneous, the court wrote:

> Our reading of precedent confirms that the Supreme Court has been careful to insulate this type of proceeding from unwarranted intrusion by the press and public. In *Richmond*, the Court recognized a presumption of openness concerning criminal trial proceedings, but the Court was careful to include this caveat:
>
>> We have no occasion here to define the circumstances in which all or parts of a criminal trial may be closed to the public ... but our holding today does not

---

1. Indeed, within a few hours after counsel for the *New York Post* argued to this court that sequestration served to insulate these jurors from the maelstrom of publicity in this case, his own client observed: "Although the jurors are sequestered, they are allowed to meet with fami-

ly members under the supervision of the court." Karen Phillips, "Shots Were a Message to Jury," *New York Post*, Mar. 11, 1992, at 2 (implying that recent attempted murder in Brooklyn, New York was intended to intimidate the jury in this case).

mean that the First Amendment rights of the public and representatives of the press are absolute. Just as a government may impose reasonable time, place, and manner restrictions, ... so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to trial. " '[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.' "

448 U.S. at 581 n. 18, 100 S.Ct. at 2830 n. 18.

*Id.* at 116 (quoting *Richmond Newspapers*). The *Edwards* court also observed that "the trial court is accorded broad discretion, 'based on law and on his own and common experience' over aspects of the trial concerning the 'handling of jurors,' e.g. sequestration, juror access to information and 'harassment of jurors.' " *Id.* (quoting *United States v. Harrelson,* 713 F.2d 1114, 1117 (5th Cir.1983)).

The functional considerations which provide the reasons to close midtrial questioning of jurors are then discussed at some length, and the court concludes:

If the questioning of impaneled jurors were held in open court, there is a substantial probability that what may have begun as a "tempest in a teapot" will end in a mistrial, a hung jury, or a reversal on appeal. The interest in preserving the jury as an impartial, functioning, deliberative body is not only a higher value than that served by openness here, it is a *sine qua non* of our system of criminal justice as envisioned in the sixth and seventh amendments. Thus, for the first amendment purposes, *no presumption of openness attaches to proceedings involving the midtrial questioning of jurors.* It follows that the trial judge did not err in failing to provide a preclosure hearing.

*Id.* at 117 (footnote omitted) (emphasis added).

Those considerations and the considerations heretofore expressed by this court apply with equal force to *in camera* interviews with prospective jurors as well as to colloquies between the court and jurors during the trial itself.

### B. *Disclosure of Voir Dire Transcripts*

■ The Supreme Court has made clear that:

the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law *right of inspection* has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." [citations omitted] Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption.... [citations omitted]

*Nixon v. Warner Comm., Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). The *Nixon* Court observed further that

[i]t is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.

*Id.* at 598–99, 98 S.Ct. at 1312–13 (footnote omitted).

*Edwards* is also instructive in this regard:

The press contends that the first amendment mandates midtrial disclosure, because sequestration is sufficient to protect the jury from exposure to publicity. To the contrary, we conclude that, de-

spite sequestration, midtrial publicity does continue to threaten the impartiality of the jurors. We previously noted the special volatility of publicity when it is focused, not on the merits of the case, but on the jurors themselves. If the substance of such incidents is played out in the press during trial, the difficulty is in insulating the jurors, not merely from media reports, but from remarks offered by others. As the district court noted, even when jurors are sequestered they are by necessity exposed to outsiders, from family members to fellow patrons in the doctor's office. The jurors are under a duty to report all untoward exposure to external information. Dutiful reporting by jurors necessitates further questioning in chambers, which leads to further media reports, from which all twelve jurors must be insulated. What may have begun as sound and fury can degenerate into a comedy of errors, only one of which need be harmful for the jury trial to be rendered a nullity.

Weighing against these difficulties are the values of prompt release. We recognize the worth of timely news reported on the front page and, by contrast, the diminished value of noteworthy, but untimely, news reported on an inside page. Implicit in that assessment, however, is the fair assumption that significant news will receive the amount of publicity it warrants. The value served by the first amendment right of access is in its guarantee of a public watch to guard against arbitrary, overreaching, or even corrupt action by participants in judicial proceedings. Any serious indication of such an impropriety, would, we believe, receive significant exposure in the media, even when such news is not reported contemporaneously with the suspect event.

The issue, simply stated, reduces to "Better sooner than later"? Given the paramount interest in maintaining an impartial jury, and its inherent vulnerability, we find no error in the district court's refusal to release transcripts of the closed proceedings before the jury reached its verdict. The trial court should nevertheless avoid unnecessary delay in releasing the record of closed proceedings after trial. When a motion is made for release of transcripts, the trial court should anticipate their probable post-trial disclosure and endeavor to release them as soon after verdict as possible.

823 F.2d at 118-19.

As has already been indicated, this case resembles *Edwards* far more than it does *Press–Enterprise I*. In the latter case, the trial court sealed all but three days of a six-week *voir dire;* in the present case, this court has sealed a few hours' worth of a two-week *voir dire* process that was otherwise accessible to the press. This case, like *Edwards*, has been the subject of unremitting, if not obsessive, press coverage that has presented particular problems of potential juror bias. Indeed, the closed *voir dire* sessions held here were precipitated by such coverage; to unseal them would run the additional risk of generating still more feedback of the sort described in *Edwards*.

To the extent that disclosure of the transcripts would also threaten to undercut juror honesty in response to later inquiries, this case also epitomizes the concerns raised in Justice Blackmun's *Press–Enterprise I* concurrence. Under the peculiar circumstances of this case, the extreme difficulty of selecting (and retaining) a fair and impartial panel required that a limited portion of the *voir dire* be sealed so that jurors might be examined as frankly and openly as possible. As the Second Circuit has observed in this vein, "in applying the balancing test mandated by the First Amendment, [a court] should give added weight to fair trial and privacy interests where requiring disclosure will have a potential chilling effect...." *In Re New York Times Co.*, 828 F.2d 110, 114 (2d Cir.1987).

While this court is mindful of the First Amendment's breadth and strength and conscious of the dictates in *Press–Enterprise I* that closure be regarded as a last resort, this court concludes that the "higher values" spoken of in that case would be ill-served by releasing the midtrial transcripts of the limited February 3 and 4 *in*

*camera voir dire* and of juror interviews from the week of March 2, 1992. The privacy interests of the jurors, the Sixth Amendment interests of the defendants, and the need (especially in the context of this case) to avoid multiplying publicity upon publicity all weigh against disclosure. Having reviewed the transcripts, the court is likewise satisfied that no less-restrictive alternative would suffice.

## II

### *Sidebar and In Camera Conferences With Counsel*

■ In the case of sidebar colloquies and *in camera* conferences, it is clear that the right of access is not a right of contemporaneous presence. For example, one Supreme Court Justice has noted that "when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion into the huddle. Nor does this opinion intimate that judges are restricted in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings." *Richmond Newspapers,* 448 U.S. at 598 n. 23, 100 S.Ct. at 2839 n. 23 (Brennan, J., concurring); *see also Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 609 n. 25, 102 S.Ct. 2613, 2621 n. 25, 73 L.Ed.2d 248 (1982) (citing with approval Justice Brennan's opinion in *Richmond Newspapers* ).

This doctrine permits not only the exclusion of the public from such conferences, but also the withholding of the transcript itself. For example, the panel in *United States v. Gurney,* 558 F.2d 1202 (5th Cir. 1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978), upheld the trial court's refusal to release transcripts of a number of sidebars. As the court noted: "Bench conferences between judge and counsel outside of public hearing are an established practice ... and protection of their privacy is generally within the court's discretion.... Such conferences are an integral part of the internal management of a trial, and screening them from access by the press is well within a trial judge's broad discretion." *Id.* at 1210.

It is true that the Third Circuit has held, in *United States v. Smith,* 787 F.2d 111, 115 (3d Cir.1986), that the First Amendment right of access applies to sidebar and chambers conferences under some circumstances. As the *Smith* court was careful to note, however, its decision applied the right of access only to sidebar conferences in which evidentiary or other substantive rulings were involved; the court expressly declined to extend the right of access even to those conferences relating only to collateral matters at trial. *Id.* at 115 n. 2.

General concerns about the fair administration of justice, whether or not within the Sixth Amendment's reach, may also serve as the basis for sealing sidebar transcripts. In *In re Application of Washington Post Co.,* 576 F.Supp. 76 (D.D.C.1983), the court dealt with issues surrounding a celebrated criminal case not unlike the present one. In that case, a panel of 175 veniremen had been called for the trial, which was expected to last for several weeks, and sequestration and other protective measures were considered (but eventually abandoned) because of publicity. *Id.* at 78. In refusing to unseal the transcripts of five bench conferences, the subject matter of which was not relevant to issues in the case, *id.* at 79 n. 5, the court pointed specifically to the likely prejudicial effect of disclosure on both the jurors and the witnesses in the case. *Id.* at 79. Moreover, the court observed that sealing the documents, which amounted to less than 20 pages out of at least 4,000 transcript pages as of that date, constituted the least restrictive alternative available to it. *Id.* at 80.

At issue in these motions are the transcripts of conferences on February 18, 19, and 20, and five conferences from the week of March 2. Because the court has already made specific factual findings in the sealed records both from February 20 and from the week of March 2, this opinion will address only the transcripts for February 18 and 19.

The motion to unseal is denied as to the transcript for February 18. That transcript—which consists of 16 pages out of over 2,200 as of that date—does not relate

to any substantive or evidentiary matter in this trial. In addition, the court finds that releasing the transcript would inflict reputational harm on a third party not currently before the court, a basis on which numerous courts have previously kept proceedings sealed. *See United States v. Smith,* 787 F.2d 111, 116 (3d Cir.1986) (records may be sealed in appropriate cases to avoid harm to third parties); *United States v. Haller,* 837 F.2d 84, 88 (2d Cir.1988) ("Protection of such privacy interests is especially important when the third parties ... may be unaware of the threatened danger to their interests and may not appear before the district court to protect themselves."); *cf. United States v. Smith,* 776 F.2d 1104, 1114 (3d Cir.1985) (court declined to unseal bill of particulars where reputational harm to unindicted coconspirators was foreseeable).

As to the five-page sealed transcript of the February 19 sidebar, the motion to unseal is likewise denied. As before, that transcript contains nothing relating to the substance of these proceedings. In declining to unseal the record, this court relies on the Supreme Court's observation in *Nixon* that courts may "refuse[ ] to permit their files to serve as reservoirs of libelous statements for press consumption...." 435 U.S. at 598, 98 S.Ct. at 1312.

Finally, after additional review of the remaining transcripts, the court concludes that pages 1039–43, pages 1206–23, and page 1478 (from line 21) to 1479 (through line 21) should be unsealed. Those segments do not implicate the values and the concerns that justify non-disclosure elsewhere.

SO ORDERED.