**UNITED STATES of America**

**v.**

**Don KING, Defendant.**

**No. 94 Cr. 455 (LMM).**

United States District Court,
S.D. New York.

Dec. 27, 1995.

Sarah N. Chapman, Assistant United States Attorney, Mary Jo White, United States Attorney, Criminal Division, New York City, for U.S.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**1.**

Daily News, L.P., the publisher of the *New York Daily News,* that paper's reporter Greg Smith, NYP Holdings, Inc., the publisher of the *New York Post,* and that paper's reporter Al Guart, apply for an order unsealing, with one exception, all transcripts sealed during the trial of the above case.[1] The sealed transcripts fall into three categories: (1) *voir dire* of prospective jurors; (2) selection of the jury through the exercise of peremptory challenges; and (3) robing room and sidebar conferences at which questions of the admissibility of evidence were discussed and ruled on. All of the matters sealed were sealed at the request or with the concurrence of the government and the defendant. Defendant opposes the application. The government takes no position.

**2.**

■ The application presents the difficult problem of accommodating the very different interests protected by the First and Sixth Amendments to the United States Constitution. The law, in its general statement, is clear enough. In *United States v. Cojab,* 996 F.2d 1404 (2d Cir.1993), it was summarized thus:

> . Freedom of the press and public to attend criminal trials and pretrial proceedings, a right conferred by the First Amendment, is not designed to override the right of a defendant to receive a fair verdict from an impartial jury. To protect a defendant's Sixth Amendment right to a fair trial, a courtroom may be closed and its records sealed. The power to close a courtroom where proceedings are being conducted during the course of a criminal

---

1. The exception is the transcript of a session held *in camera* with Jack Newfield, a *New York Post* columnist whose notes had been subpoenaed by defendant, during which Mr. Newfield read those notes to the Court, in order to aid the Court in its *in camera* review of the notes in response to Mr. Newfield's motion to quash the subpoena. Neither the government nor defendant was present or represented at the *in camera* session with Mr. Newfield.

prosecution and/or to seal the records of those proceedings is one to be very seldom exercised, and even then only with the greatest caution, under urgent circumstances, and for very clear and apparent reasons.

996 F.2d at 1405.

■ The general proposition that trials are to be open to the public and the press is explicitly rooted in the first place in the Sixth Amendment, which couples it with the right to an impartial jury. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; . . . ." U.S. Const., Amend. VI. *See Estes v. Texas,* 381 U.S. 532, 538–39, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965) ("The purpose of the requirement of a public trial was to guarantee that the accused would be fairly dealt with and not unjustly condemned.") The proscription of "[c]riminal proceedings conducted in secret," *Cojab,* 996 F.2d at 1407, is thus principally concerned with the protection of the accused. That is not at issue here, where it is the defendant himself who seeks to maintain closure of the portions of the transcript at issue so that he may receive a fair trial by an impartial jury.

**3.**

The following facts are relevant to the present application.

Defendant is a prominent promoter of boxing matches who has, for some while, received considerable attention from the press and other media. Press coverage concerning the charge which is the subject of the present case appeared even prior to the filing of the indictment. Very shortly before trial, a book by Mr. Newfield, titled *Only in America: The Life and Crimes of Don King,* was published. From the very beginning of the case, it was extensively covered by the press. Much of the press coverage relating to defendant is negative, and much deals with supposed conduct on his part which is plainly

both inadmissible in evidence and prejudicial. Defendant is black.

*Voir dire* was conducted in the jury room, one prospective juror at a time, with only the Court and counsel present.[2] The immediate proximity of the jury room to the courtroom would have made it readily apparent to anyone in the courtroom that the *voir dire* was being conducted in the jury room, into which prospective jurors were called from the courtroom in succession, over a period of days. No member of the press sought to be present for the *voir dire.*

The exercise of peremptory challenges took place in the robing room, at sidebar, and in the courtroom. What took place in the courtroom, of course, is not at issue on the present application. No member of the press sought to be present at the robing room or sidebar segments of the process of the exercise of peremptory challenges.

From time to time during the trial, the Court held conferences with counsel either in the robing room, or, more briefly, at sidebar, concerning evidentiary matters. During these conferences both sides discussed the admissibility of proffered evidence. Some evidence was excluded. No member of the press sought access to these conferences.

The trial ended on November 17, 1995, when the jury was discharged because it could not reach a unanimous verdict. The government has stated that it will seek a second trial, no date for which has as yet been set. The first application for the release of sealed transcripts was made on November 27, 1995.

**4.**

With respect to the transcripts of *voir dire,* applicants rely primarily on *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*"), relating to a prosecution for rape and murder which resulted in a conviction and death sentence.

In *Press–Enterprise I,* the petitioner had, prior to commencement of *voir dire,* moved that it be open to the press and public. The

---

**2.** The defendant himself waived his presence, in order that prospective jurors would be candid in their views of him.

State opposed, "arguing that if the press were present, juror responses would lack the candor necessary to assure a fair trial." 464 U.S. at 503, 104 S.Ct. at 820. The motion was, substantially, denied. The trial judge "permitted petitioner to attend only the 'general voir dire.' He stated that counsel would conduct the 'individual voir dire with regard to death qualifications and any other special areas that counsel may feel some problem with regard to ... in private....'" *Id.* (citation to record omitted). Petitioner moved after the jury was empaneled, and again after conviction and sentence, for release of the transcript of the closed *voir dire,* and those motions were denied, largely on the basis of the jurors' right of privacy. A state appellate court affirmed, but the Supreme Court vacated that court's judgment, and remanded for proceedings not inconsistent with its opinion.

The Supreme Court indicated the procedure that should have been followed:

> To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record.

> By requiring the prospective juror to make an affirmative request, the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy. This process will minimize the risk of unnecessary closure. The exercise of sound discretion by the court may lead to excusing such a person from jury service. When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguard-

ing the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment. 464 U.S. at 512, 104 S.Ct. at 825. As to the relief to be granted, the indicated procedure not having been followed, the Supreme Court said that "[t]he trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected." 464 U.S. at 513, 104 S.Ct. at 825–26.

Two significant differences between *Press–Enterprise I* and the present case are immediately apparent: first, the petitioner in *Press–Enterprise I* sought to attend the *voir dire* before it had begun; second, the trial in *Press–Enterprise I* resulted in a verdict.

■ In the present case, the failure of any member of the press to seek to attend the *voir dire*—although, if present, the press had "a means of learning that a closure or sealing order [had] been proposed or issued," *United States v. Haller,* 837 F.2d 84, 87 (2d Cir. 1988)—can be viewed as a waiver of the right to do so. *See Gannett Co. v. DePasquale,* 443 U.S. 368, 370, 99 S.Ct. 2898, 2912, 61 L.Ed.2d 608 (1979) ("none of the spectators present in the courtroom, including the reporter employed by the petitioner, objected when the defendants made the closure motion"); *United States v. Gleeman,* No. 92 Cr. 878, 1992 WL 316167 (S.D.N.Y. Oct. 20, 1992) (McKenna, J.). But such a waiver would not necessarily extend to a post-trial motion for access to transcripts. *Gleeman,* 1992 WL 316167 at *1.

■ Nevertheless, there remains a problem. The jurors interviewed during the *voir dire* were aware that the press was not present during their questioning, and they may well have answered questions more candidly than they might have done had the press been present. Further, the jurors may well have treated the circumstances of the *voir dire* as an implied promise that what they said would not be made public. Should the Court now release transcripts of the *voir dire,* defendant argues, the Court could be put in the position of having broken such an

implied promise. The argument that prospective jurors were given an implied promise of confidentiality (an argument with which the Court is sympathetic), however, was raised in *Press–Enterprise I,* 464 U.S. at 503–05, 104 S.Ct. at 821, and was given weight only to the extent that it may have contributed to the direction that, prior to releasing transcripts, the trial court should seal such parts as necessary to preserve anonymity. *Id.* at 511–13, 104 S.Ct. at 825–26.

In the present case, however, there is to be a second trial, a problem not before the Supreme Court in *Press–Enterprise I.* Defendant argues that the publication of even anonymous jurors' responses to *voir dire* questions after they had been impliedly promised confidentiality could induce at least some prospective jurors for the second trial to be guarded in their responses to *voir dire* questions.

Surely, "the defendant has an interest in protecting juror privacy in order to encourage honest answers to the *voir dire* questions." *Press–Enterprise I,* 464 U.S. at 515, 104 S.Ct. at 827 (Blackmun, J., concurring) (footnote omitted). Candor on the part of jurors is of particularly great importance in this case as regards attitudes towards the defendant, who, as noted, has been the subject of considerable press attention, and, just as important, in the delicate area of possible racial bias. It is no doubt a difficult thing for any person to admit to any degree of racial bias, but to do so for publication might well require what the theologians used to call heroic virtue. The importance of *voir dire* in uncovering racial bias would be hard to overestimate. *Cf. id.* at 521–22, 104 S.Ct. at 830 (Marshall, J., concurring).

█ The question is whether release at this time of transcripts of *voir dire* is "likely to prejudice the guarantee of a fair trial." *Cojab,* 996 F.2d at 1408. If so, then the Court must take measures to prevent that prejudice. "No right ranks higher than the right of the accused to a fair trial." *Press–Enterprise I,* 464 U.S. at 508, 104 S.Ct. at 823. Indeed, "our criminal justice system

permits, and even encourages, trial judges to be overcautious in ensuring that a defendant will receive a fair trial." *Gannett,* 443 U.S. at 379 n. 6, 99 S.Ct. at 2905 n. 6. Closure must, however, be supported by findings "demonstrating that (1) closure is necessary to safeguard defendant's right to a fair trial, and (2) the order directing closure is narrowly drawn so as to serve that specific, identifiable interest." *Cojab,* 996 F.2d at 1408 (citing *Press–Enterprise I,* 464 U.S. at 509–11, 104 S.Ct. at 824).

The specific unfairness identified by defendant in the present context is that the release of transcripts of the *voir dire* of prospective jurors for the first trial (even though redacted to ensure anonymity) would have a chilling effect on the candor of prospective jurors during *voir dire* for the second trial. Such an effect has been recognized in this Circuit as a legitimate factor to be considered in assessing the First Amendment rights of the press as against a defendant's Sixth Amendment right to a fair trial, albeit in a different context than *voir dire* (papers filed in connection with pretrial motions to suppress evidence obtained by electronic surveillance). In *In re The New York Times Co.,* 828 F.2d 110 (2d Cir.1987), the Court of Appeals said:

> [W]here a potential future chilling effect results from the application of a qualified First Amendment right of access, the chilling effect need not be ignored. The court, in applying the balancing test mandated by the First Amendment, should give added weight to fair trial and privacy interests where requiring disclosure will have a potential chilling effect on future movants.

828 F.2d at 114. That press coverage of past *voir dire* can have a chilling effect on the *voir dire* of subsequently interviewed prospective jurors is not a fanciful proposition. *See Application of Daily News,* 787 F.Supp. 319, 321 (E.D.N.Y.1992) (prospective jurors who had read in press responses of others during *voir dire* "questioned the court's assurances that their anonymity would be sedulously guarded.").[3] Such a chilling effect

---

**3.** The Court, of course, does not mean to suggest any other parallels between the present case and

the prosecution underlying the cited case, in particular any possible fear on the part of prospec-

on prospective jurors is a serious impediment to a fair trial brought about when publicity "is focused, not on the merits of the case, but on the jurors themselves." *Id.* at 325.

In all of the circumstances of the present case, the Court finds that there is a substantial probability that the release at this time of transcripts of the *voir dire* of prospective jurors for the first trial will reduce the candor of prospective jurors during *voir dire* for the second trial, and that such a reduction of candor on the part of prospective jurors will affect the fairness of the second trial in that the ability of the Court and counsel to uncover attitudes of prospective jurors which would be the basis for challenges will be impeded. Redaction of the transcripts of the *voir dire* for the first trial to render them anonymous will not assure that such a reduction of candor will not occur: that effect will flow from a perceived focus of publicity on jurors, rather than on the merits of the case, and a consequent concern that their responses to *voir dire* questioning in sensitive areas will be published. Accordingly, in order to implement the Sixth Amendment guarantee of a fair trial, the Court will not at this time release transcripts of *voir dire*.[4]

### 5.

■ Counsel for defendant has acknowledged that it is difficult to apply to the second category of sealed transcripts, *i.e.,* the exercise of peremptory challenges, the arguments that counsel against release of the *voir dire* (although defendant still opposes release of the second category). (Transcript of Oral Argument, Dec. 6, 1995, at 36–37.) The Court cannot disagree. Nor has the government objected to release of those (or any other) transcripts. The Court does believe, however, that the instruction of *Press–Enterprise I* that anonymity be preserved, 464 U.S. at 511–13, 104 S.Ct. at 825–26, applies to the second category. Accordingly, the government and defendant are directed to submit within five business days of the date of this Memorandum and Order, jointly after conferring, two copies of the sealed transcripts of the selection of the jury

through the exercise of peremptory challenges, for the Court's review. The government and defendant may (but are not required to) suggest portions of the transcripts that should be redacted to preserve the anonymity of the jurors or prospective jurors concerned. The parties' suggestions in this regard are to be filed under seal, subject to further order of the Court. The transcripts (redacted to the extent necessary) will be released as soon as possible.

### 6.

■ Finally, applicants seek the release of transcripts of robing room and sidebar conferences during which the Court discussed with counsel primarily issues relating to the admission or exclusion of evidence. The principal federal appellate decision dealing directly with this category of material appears to be *United States v. Smith,* 787 F.2d 111 (3d Cir.1986). In that case, the court noted that there are reasons to modify the right of the public and press to be present at such conferences even though they involve "evidentiary rulings that could affect the course of the trial." 787 F.2d at 114.

> There are, however, countervailing considerations that may militate against contemporaneous access, most notably concern that evidence that the court has ruled inadmissible should not find its way to the jury's attention. In most circumstances, it would be sufficient to make the ruling in open court but outside the presence of the jury. In other circumstances, it may be more efficient for counsel and the trial judge to speak at sidebar or in chambers than for the jury to be removed from the courtroom when questionable evidence *is* at issue. Barring the press and the public from these conferences may help ensure the fairness of the trial itself.

*Id.* However,

> [a]lthough the public and press may be justifiably excluded from sidebar and chambers conferences even when substantive rulings are made, the public interest in

---

tive jurors, which is not a factor in the present case.

4. In the language of *Press–Enterprise I,* this is not "a reasonable time," 464 U.S. at 512, 104 S.Ct. at 825, to release such transcripts.

the ruling is not diminished. At some stage, and we need not in this case decide precisely when, that ruling must be available for public review so that the purposes of open trials can be satisfied.

*Id. See also Application of Daily News,* where the court noted not only that "[i]n the case of sidebar colloquies and *in camera* conferences, it is clear that the right of access is not a right of contemporaneous presence," but also that "[t]his doctrine also permits not only the exclusion of the public from such conferences, but also the withholding of the transcript itself." 787 F.Supp. at 326 (citations omitted).

In the present context, the problem that must be considered is whether the release of transcripts of those robing room and sidebar conferences at which inadmissible and prejudicial evidence was identified and discussed would jeopardize defendant's right to a fair trial by bringing that evidence to the attention of the prospective jurors for a second trial.

█ That inadmissible and prejudicial evidence should not be put before a jury is a given. Instructing a jury to disregard such evidence which may have come to its attention will not, in all cases, be an adequate remedy, since, in some situations, if such evidence does become available to a jury, a mistrial may be required. *Application of New York Times Co.,* 708 F.Supp. 603, 606 (S.D.N.Y.1989) (citation omitted).

Here, of course, there is no presently empaneled jury. The sort of evidence which is of concern will, if the transcripts in question are released in their entirety, come to the attention of only prospective jurors. That, applicants suggest, resolves the problem, because jurors who have been exposed to the evidence can simply be excused. The Court disagrees.

While the parties have not cited a case in which the First Amendment right to access was weighed against a defendant's Sixth Amendment right to a fair trial in the specific procedural posture present here—a request for access to evidence excluded at a first trial so that it can be published before jury selection for a second trial—there is a good analogy in those cases in which access to pretrial evidentiary hearings was sought. Such a situation was before the Supreme Court in *Gannett Co. v. DePasquale* (pretrial suppression hearing) and in *Press–Enterprise Co. v. Superior Court of California,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("*Press–Enterprise II*") (preliminary hearing). The Court in *Gannett* recognized that there is a legitimate concern about releasing such evidence before trial.

Publicity concerning pretrial suppression hearings such as the one involved in the present case poses special risks of unfairness. The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury. Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.

The danger of publicity concerning pretrial suppression hearings is particularly acute, because it may be difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial. After the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means. When such information is publicized during a pretrial proceeding, however, it may never be altogether kept from potential jurors. Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such information throughout the community before the trial itself has even begun.

*Gannett,* 443 U.S. at 378–79, 99 S.Ct. at 2905 (citations and footnote omitted). Though access may for a time be denied for the reasons described in *Gannett,* the transcripts in that case were subsequently released.

[A]ny denial of access in this case was not absolute but only temporary. Once the danger of prejudice had dissipated, a transcript of the suppression hearing was

made available. The press and the public then had a full opportunity to scrutinize the suppression hearing. Unlike the case of an absolute ban on access, therefore, the press here had the opportunity to inform the public of the details of the pretrial hearing accurately and completely. Under these circumstances, any First and Fourteenth Amendment right of the petitioner to attend a criminal trial was not violated. *Id.,* 443 U.S. at 393, 99 S.Ct. at 2912 (footnote omitted).

The Court understands *Gannett* to approve a temporary withholding of access to transcripts of robing room and sidebar conferences at which, during the first trial, inadmissible and prejudicial evidence was identified and discussed, at least until a jury for the second trial has been impaneled. All of the considerations identified by the Supreme Court as justifying such a result are present here.

In *Press–Enterprise II,* the Supreme Court found that the denial of access went too far. There, the press was denied access to the entire transcript of a forty-one day preliminary hearing, even when, as the Court noted, the defendant in the underlying prosecution had waived his right to a jury trial, 478 U.S. at 3–5, 11–13, 106 S.Ct. at 2738, 2742, thus obviating most of the concerns identified in *Gannett.* The Court acknowledged, however, citing *Gannett,* that the release before trial of some evidence could pose risks of unfairness, 478 U.S. at 13–15, 106 S.Ct. at 2743, but indicated that denial of access must be based on more than a conclusory assertion of prejudice and be narrowly tailored. *Id.*

To determine which portions of the transcripts at issue carry with them a substantial probability that their release at this time will deny defendant's right to a fair trial by an impartial jury, accompanied, of course, by an opportunity for defendant to make known his position as to particular matters, will require a review of the transcripts. Only after such a review, and consideration of defendant's arguments as to specific matters, can the Court effectuate "the lease restrictive alternative that will effectively protect the rights of the defendant[ ] in this case." *Application*

*of New York Times Co.,* 708 F.Supp. at 606 (citing *Press–Enterprise II,* 478 U.S. at 13–15, 106 S.Ct. at 2743–44).

Accordingly, the government and defendant are directed to submit within ten business days of this Memorandum and Order, jointly after conferring, two copies of the sealed transcripts of sidebar and robing room conferences, for the Court's review. The government and defendant may (but are not required to) suggest portions of the transcripts that should remain sealed in the interests of the fairness of a second trial. The parties' suggestions are to be filed under seal, subject to further order of the Court. Transcripts the release of which the Court determines do not have a substantial probability of jeopardizing the fairness of a second trial will then be released; the Court will determine, in connection with its review, the appropriate time for release of those portions of the transcripts that are not to be released initially.

SO ORDERED.